```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                       Richmond Division


MINH T. GIANG,
a/k/a ROSALINN M. GIANG,

     Plaintiff,

v.                                    Civil Action No. 3:04cv561

JOHN E. POTTER,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE,

     Defendant.
```

**MEMORANDUM OPINION**

Defendant, John E. Potter, Postmaster General, has moved for summary judgment in this matter pursuant to Fed. R. Civ. P. 56. The Plaintiff, Minh T. Giang, has not responded. For the reasons set forth below, Defendant's Motion for Summary Judgment (Docket No. 11) is granted.

**BACKGROUND**

In this action, Giang, a current employee of the United States Postal Service ("USPS"), challenges the conditions of her employment, alleging discriminatory and retaliatory treatment in violation of Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e-16, and the Pregnancy Discrimination Act, 42 U.S.C. § 2000e-1, et seq.

Giang began working with the Postal Service on October 14, 1995, at the Richmond Processing and Distribution Center ("RPDC") in Richmond, Virginia. See Exhibit 1, Declaration of Susan Pettus, Attach. A. At all times relevant to this litigation, Giang worked

as a Part-Time Flexible Mail Processor, PS-4.[1]  Id.  When Giang was at RPDC, Alan Friedman served as Manager of Distribution Operations, Tour 1.  See Exhibit 2, Declaration of Alan Friedman, ¶ 1.

On July 10, 1997, Giang wrote a memorandum to Friedman, requesting a meeting to discuss a problem that she was having on Tour 3 in the Automation Unit.[2]  See Exhibit 1, Attach. B.  The meeting was delayed because the union representative, Bianca Baskerville, and Friedman were not available at the same time.  See Exhibit 2, ¶¶ 2, 6.

Friedman met with Baskerville and Giang on August 5, 1997.  See Exhibit 2, ¶3.  During the meeting, Giang related problems she was having with Carlton Finney and Ann Hall, who were the two acting supervisors on Tour 3.  Id.  Giang told Friedman that she believed Finney and Hall were discriminating against her because of her race and color; and that Friedman was directing their actions against her.  Id.  Friedman informed Giang that he had not told the supervisors to harass her.  Id. at ¶4.  Giang also accused Friedman of tacitly approving behavior of Finney and Hall because he would not meet with Giang sooner.  Id. at ¶¶ 4, 5.  Friedman explained the problems he had encountered in scheduling the meeting and

---

[1] On September 26, 1998, Plaintiff transferred to Oklahoma City, Oklahoma, where she continues to work as a Part-Time Flexible Mail Processor.

[2] The work schedule at the Postal Service is divided into three timeframes, which are called "tours."  Tour 3's working hours are from approximately 3:00 p.m. to 11:00 p.m.

assured Giang that he had no discriminatory animus toward her.  Id. at ¶6.

After the meeting, Friedman spoke to Finney and Hall.  In response to Plaintiff's allegations, Finney and Hall stated that Giang was a difficult person with whom to work and that she did not follow directions.  See Exhibit 2, ¶8.  Finney and Hall further stated that they had discussed Giang's work performance with her; but represented that they had not pursued any corrective or disciplinary actions against her.  Id.  Friedman, apprehending a possible language barrier, asked Finney and Hall whether Giang had understood the instructions.  Id. at ¶9.  Finney and Hall reported that Giang had understood their instructions, but that she had a difficult time carrying them out.  Id.  Friedman does not recall speaking with Giang after the meeting.  See Exhibit 2, ¶10.

On September 17, 1997, Giang filed an Information for Precomplaint Counseling USPS's Equal Employment Opportunity office. See Exhibit 1, Attach. C.  In this complaint, Giang alleged that Friedman and other supervisors purposely had harassed, discriminated, and been rude to her.  She also alleged retaliation. Id.  One of the supervisors named by Giang, Frank B. Hayes, was a Supervisor in Distributions Operations.  See Exhibit 3, Declaration of Frank Hayes, ¶1.  Giang had been assigned to Hayes' unit after she had complained about problems in her previous unit; however, Hayes had no knowledge of Giang's prior EEOC complaint.  Id. at ¶¶ 7-10.  Furthermore, during the time period in question, Hayes had no knowledge that Giang was pregnant.  See Exhibit 3, ¶11.

While Giang worked in Hayes' unit, the following incidents occurred:

1. Giang had taken a 25 minute break, instead of the 15 minute break allowed. See Exhibit 3, ¶3. Hayes asked Giang about her tardiness when she returned to the work unit. Id. at ¶4. Giang reacted very emotionally, denying that she had been gone for 25 minutes. Id. at ¶5. To calm Giang, Hayes just asked her to take 15 minute breaks in the future. Id. at ¶¶ 4, 5.

2. Hayes was in the middle of explaining a machine jam to Giang, when she began to walk away from the conversation. Id. at ¶6. Hayes called Giang's name several times as he followed her so as to continue their conversation. Id. When Giang finally responded, she accused Hayes of "hollering" at her. Id. Hayes denied yelling and explained that he was only trying to get her attention. Id. at ¶7.

3. On November 2, 1997, Giang left work requesting five hours of sick leave. Id. at ¶11. Giang then submitted a physician's note, indicating that she was incapacitated following her miscarriage; that was the first time that Defendant learned that Giang had been pregnant. Id. Giang was certified as totally incapacitated from November 3, 1997 through December 13, 1997, and was granted leave for that time period. See Exhibit 1, Attach. D.

On February 28, 1998, Giang requested EEOC counseling, claiming discrimination based upon her race, color, sex, national origin and prior EEOC activity. Specifically, Giang alleged that, on February 12, 1998, she was required to stay in her unit and process mail after all other Part-Time Flexible ("PTF") employees were permitted to leave the unit at 12:55 a.m. See Compl., ¶18. Geraldine Gregory, a Supervisor in Distribution Operations, was Giang's supervisor at this time.³ See Exhibit 4, Declaration of

---

³ Gregory was unaware of Giang's prior EEOC activity; furthermore, Gregory has advised that Giang's race, sex, color,

4

Geraldine Gregory, ¶¶ 1, 2.  At approximately seven minutes before the end of her tour, Giang got up from her seat to get her badge. Id. at 2.  Gregory asked Giang and two other employees to take a handful of mail and process it before 1:00 a.m.  Id.  Giang told Gregory that it was time to clock-out.  Id. at ¶3.  Gregory advised Giang that seven minutes remained before the end of the shift, which would give her plenty of time to sort through the handful of mail.  Id. at ¶3.  Gregory then divided the mail to be processed evenly among the three employees and placed Giang's share on her ledge.  Id. at ¶4.

In Spring 1998, Giang's pattern of odd behavior continued. For example, Gregory asked Giang to remove the paper towels that she had left on her seat.  Giang perceived this event as an act of rudeness.  See Exhibit 4, ¶6; Compl., ¶¶ 12, 13.  Also in the Spring, Friedman had requested employees not to wear earphones while walking around because of safety concerns; again Giang perceived this as an act of rudeness.  See Exhibit 2, ¶7; Compl. ¶15.

Based upon Giang's reaction to these incidents, as well as comments made by her to other USPS employees, Dan Jenkins, Manager of Distribution Operations, Tour 3, determined that Giang should undergo a fitness-for-duty examination to determine if she was emotionally fit to work in the mail processing environment.  See Exhibit 5, Declaration of Dawn Jenkins, ¶¶ 2, 3. For example,

---

and/or national origin were not factors in her treatment.  See Exhibit 4, ¶5.

5

Jenkins had become aware of Giang's written statements about having nightmares which Giang described in detail, by stating that "devils" were chasing her and that the "devils" made references to "violence in the workplaces." Id. at ¶2.

Dr. Leon Dixon conducted a fitness-for-duty examination of Giang. See Exhibit 6, Declaration of Leon Dixon, ¶2. The purpose of the review was to determine whether Giang was experiencing underlying medical and/or emotional problems. Id. In August 1998, Dr. Dixon conferred with Giang and determined that she was fit for duty.[4] Id. at ¶3.

On August 24, 1998, Joseph Mitchell, Supervisor of Distribution Operations, instructed Giang to occupy seat 13 and Rod Jones to occupy seat 14 in the mail processing unit. See Exhibit 7, Declaration of Joseph Mitchell, ¶¶ 2-4. However, Giang refused to take her assigned seat. Id. at ¶3. Mitchell reported other occasions when Giang had failed to follow the instructions of her supervisors. Id. at ¶5.

The foregoing incidents were the basis of several EEOC complaints that Giang filed against USPS. On May 25, 2000, these complaints were consolidated into one action by an Administrative Law Judge ("ALJ"). See Exhibit 1, Attach. E. However, in January 2002, Giang withdrew her request for a hearing. Therefore, USPS was given the authority to issue the final agency decision of no discrimination. Id. Giang timely filed an appeal to the Office of

---

[4] Giang was in a paid status during the time she attended the examination, and the examination was paid for by the USPS.

the Federal Operations ("OFO"), and, on March 9, 2004 OFO affirmed the USPS' decision. See Exhibit 1, Attach. G. Giang timely filed a request for reconsideration, which OFO denied on May 4, 2004. See Exhibit 1, Attach. H. Giang then timely brought this action.

**THE STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The rules further provide:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motion, and to identify the parts of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 216 (4th Cir. 1987). "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'" Celotex, 477 U.S. at 324. The moving party may also use affidavits to support its motion. Then the non-moving party must go beyond the pleadings and, by citing its own affidavits or by citing "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. Opposition to a properly documented summary judgment motion may not be based solely on the pleadings. Id.

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added). It is the function of the district court not to weigh the evidence, but to determine whether there is a genuine issue for trial, and "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. at 249 (citations omitted). Hence, summary judgment is appropriate if the evidence is "merely colorable" or "not significantly probative." Id. at pp. 249-50 (citations omitted). The standard for summary judgment mirrors the standard for directed verdict (now judgment as a matter of law) under Rule 50(a), Fed. R. Civ. P., the principal difference being procedural. Id. at 251. And, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to

the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." Anderson, 477 U.S. at 257. The district court also "must view the evidence presented through the prism of the substantive evidentiary burden." Id. at 254.

Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. Allstate Financial Corp. v. Financorp, Inc., 934 F.2d 55, 58 (4th Cir. 1991). But, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); see also Guinness PLC v. Ward, 955 F.2d 875, 883 (4th Cir. 1992). With these principles in mind, the court will consider the motion for summary judgment filed by USPS.

Giang has made no response to the motion for summary judgment. The motion could be granted for that reason alone. However, the Court will consider the motion on its merits.

9

**DISCUSSION**

**A. General**

Giang has alleged no direct evidence of discrimination. Thus, she must proceed under the proof scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973). Hence, Giang must establish, by a preponderance of the evidence, a prima facie case of discrimination. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If she is successful in so doing, the burden of proof shifts to the defendant to "rebut the presumption of discrimination by producing . . . a legitimate, nondiscriminatory reason for his action, then the presumption raised by the prima facie case is rebutted and "drops from the case." Id. at 255 n.10. Giang must then show that the articulated nondiscriminatory reason is merely a pretext. McDonnell Douglas, 411 U.S. at 804.

To establish a prima facie case that she was subjected to discrimination, Giang must show that: (1) she is a member of a protected class; (2) she was qualified for her job and her performance was satisfactory; (3) despite her qualifications, she was demoted; and (4) her previous position remained open to similarly qualified applicants following her demotion. See Love-Lane v. Martin, 355 F.3d 766, 787 (4th Cir. 2004); see also Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998).

To establish a hostile work environment claim, Giang must show that she was the subject of conduct that was: (1) unwelcome; (2) based upon her race; and (3) sufficiently severe or pervasive to

10

alter the conditions of her employment and create an abusive atmosphere; and (4) that there is some basis for imposing liability upon the employer. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). See also Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir. 2004). In assessing whether a work environment is objectively hostile, courts consider the totality of circumstances. That includes the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating or a mere offensive utterance and whether it unreasonably interfered with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

To establish a prima facie case of retaliation, Giang must show that: (1) she engaged in a protected activity; (2) her employer took adverse employment action against her; and (3) a casual connection existed between the protected activity and the asserted adverse action. See King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir. 2003); Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir. 2001). See also 42 U.S.C. § 2000e-3(a).

Applying the facts of Giang's case to this analysis, Giang cannot demonstrate that USPS' decisions regarding her employment were based upon anything more than her inability to perform her duties.

### 1. There is no Prima Facie Case of Discrimination or Retaliation

Giang's discrimination case and her retaliation case fails, as a matter of law, because she did not suffer an adverse employment

11

action.[5] She remained in her position, at the same grade and salary, throughout all of these events. She was never suspended or disciplined in any way. At most, Giang was asked to submit for a fitness-for-duty examination. However, she was in paid status during this examination. The examination was not an adverse employment action. In sum, Giang provided no evidence suggesting that any action taken by her supervisors resulted in demotions or decreases in pay, or otherwise adversely affected the terms of her employment in any way. Von Gunten v. Maryland, 243 F.3d 858, 861 (4th Cir. 2001) (no adverse actions or hostile environment where employer withdrew use of an employee's state car, made a minor downgrade in her evaluation, changed her job assignment, scrutinized her sick leave, required her to document future leave, had an employee question her, and improperly handled other administrative matters); see generally Munday v. Waste Management of North America, Inc., 126 F.3d 239, 242-43 (4th Cir. 1997) (manager's yelling at employee and telling other employees to ignore and spy on her were not adverse employment actions).

Accordingly, summary judgment for USPS is appropriate on these claims.

---

[5] The Complaint does not allege that USPS was aware of her pregnancy during the time period in question. Nothing in the record suggests such an awareness. And, once USPS learning of her miscarriage, it is undisputed that Giang was given liberal leave. Giang's case of pregnancy discrimination fails for that reason alone.

   **2.    There is no Showing of a Sustainable Claim for a Hostile
          Work Environment**

Construing the evidence in a light most favorable to Giang, her hostile work environment claim fails because, under a totality of circumstances, there is no evidence that the alleged conduct was based upon Giang's membership in a protected class nor that it was sufficiently pervasive or severe to alter a term or condition of her employment and to create an abusive atmosphere.  Accordingly, USPS is entitled to summary judgment on the hostile work environment claim.

**CONCLUSION**

For the foregoing reasons, the Defendant is entitled to summary judgment on all counts.  Accordingly, Defendant's Motion for Summary Judgment (Docket No. 11) is granted.  The action will be dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to the plaintiff and to counsel for the defendant.

It is so ORDERED.

_____/s/_____
Robert E. Payne
United States District Judge

Richmond, Virginia
Date: _____

13
